20th, Baker was in possession of the premises, resisting the process of forcible entry and detainer instituted to oust him therefrom; his furniture was also there, subject to attachments for the benefit of the petitioners, who had at that time a much larger interest at stake in the same property, by reason of their lien on the same, for the amount paid by them to the lessors. They were therefore, as it were, compelled to discharge the claim for the subsequent rent, which was secured on the property, subject to their liens and attachment, as the claim for rent most certainly would have priority over the claim by attachment. The payment of the subsequently accruing rent was not strictly by force of the provisions of the law before cited, and it did not, therefore, strictly acquire for its security a lien as provided by statute, which would require the payment by the officer from the proceeds of sale; but its payment from these proceeds may, in my view, be justified under the circumstances, as against the assignees of the bankrupt by the principle of subrogation, which is frequently adopted by courts of equity. If the mortgage is to be deemed as now outstanding for the security of the payment of the rent, which under the circumstances may well admit of doubt, as the mortgagees upon notice have not objected to the sale of the mortgaged property, or to the granting of the prayer of the present petition, it is possible that the mortgagees might interpose and object, and that as against them and their future claims under this mortgage, the petitioners could not insist on being subrogated to their rights, qua the payment made by them for this subsequent rent; but I do not think the assignees in bankruptcy are at liberty to insist on this objection in behalf of general creditors: "It is a well settled and familiar principle that he, who acquires an interest in an estate that is subject to a mortgage or other charge, acquires at the same time the right to pay off such mortgage, or to exonerate the estate in the same manner that he would have been entitled, who created the incumbrance; and that in so doing he becomes substituted in the place of him to whom he has paid the money, in all cases in which it is necessary for his protection that the incumbrance should be kept alive; and he will in all cases of making such payment be deemed the assignee, if an assignment will better subserve the ends of justice than payment and extinction would do." Fletcher v. Chase, 16 N. H. 42.

## Case No. 763.

### In re BAKER.

[14 N. B. R. 433; 14 Alb. Law J. 294.]

District Court, N. D. New York. Aug., 1876.

BANKRUPTCY—PREFERENCES—KNOWLEDGE OF CREDITOR.

[The value of the stock in trade of a debtor, who had little other property, was about equal to his indebtedness to his brother, and he owed other debts nearly double in amount. This brother with knowledge of the value of the stock, without inquiry into the debtor's circumstances, intimation of summary measures, or effort to obtain payment, began suit for the whole amount. The debtor, pending the suit, made no attempt to get an accommodation, but remained on friendly terms with his brother, bought on credit, and made payments to certain creditors from the proceeds of sales. The brother delayed 10 days in entering judgment and issuing execution. Held, that the parties intended to secure a preference, the debtor cooperated thereto, the creditor relied on such co-

operation, and the judgment obtained by him was therefore void.]

[Cited in Parsons v. Caswell, 1 Fed. 78; In re Keller, Case No. 7,654.]

[In bankruptcy. Petition by a creditor of Jerome E. Baker, a bankrupt debtor, that a judgment recovered by him against the debtor and execution levied upon his property be declared a lien upon the proceeds of his estate in bankruptcy. Denied.]

WALLACE, District Judge. I cannot concur in the conclusion of the register, that the proofs herein fail to show that the bankrupt procured his property to be seized on the execution obtained in favor of his brother. The nature of transactions like the one involved almost uniformly precludes the production of any but circumstantial evidence. Parties who collude to evade the law shield their actions from the cognizance of witnesses, and generally fortify their case by suppressing the truth, or misrepresenting the facts when called upon to testify. But it generally happens that the usual indicia of fraud will be detected, and when these are found, if they suffice to convince the judicial mind of the illegal character of the transactions involved, the testimony of the parties will receive but little credence. In order to determine that the judgment and execution in this case are invalid, it is necessary to find upon the proofs that when his property was seized, the debtor was insolvent or in contemplation of insolvency; that he procured his property to be seized with an intent to give his brother a preference; and that the brother had reasonable cause to believe the debtor to be insolvent, and knew that the seizure was made in fraud of the provisions of the bankrupt act. That the debtor was insolvent when the action was commenced in which the judgment was obtained; that he intended his brother should obtain a preference over his other creditors, by means of the judgment and execution, and that the brother was cognizant of these facts, I cannot entertain any doubt; and if, in addition, it can be found that the debtor facilitated this end by any affirmative action on his part, and the creditor was aware of it, the case is made out. At the time the action was commenced in which the judgment was obtained, the property of the debtor consisted only of his stock and accounts in trade; and, according to his own testimony, the stock was about equal in value to the amount of his brother's debt, while his other debts were nearly double in amount, and his accounts were of trifling value. The debt of the brother was for borrowed money, and constituted almost the entire capital with which the debtor commenced business, and no part of the principal had ever been paid. The brother and the bankrupt were on friendly and intimate terms. Apparently without any inquiry into the debtor's circumstances,

and without any effort to obtain payment of any part of the loan, and without any intimation of summary measures, the brother, who was personally conversant with the ostensible value of the debtor's stock in trade, commenced suit for an amount which would necessarily absorb the whole of it. It would seem that not only was no effort made by the debtor for an accommodation or extension, but that no word of expostulation or of intercession was uttered by him, while no expression of sympathy or regret escaped from the lips of the creditor during the pendency of the action; an impressive silence fell upon the parties, and the Sunday visits, when the creditor remained from Saturday until Monday with his debtor, were characterized by an utter negation of all unpleasant topics. While these circumstances justify the conclusion that both parties intended that the creditor should get his debt, to the exclusion of other creditors, and excite a violent suspicion of collusion, they fail, probably, to show anything more than a passive acquiescence on the part of the debtor in the creditor's proceedings.

As the law now stands, a failing debtor may undoubtedly suffer a brother or any friendly creditor to obtain a preference, by means of legal process; he may resign himself to the purpose of the creditor with perfect tranquillity, and enjoy heartfull pleasure in the experience. More than this the wisdom of the law does not permit, and if, by any active participation with the creditor, he facilitates the seizure of his property, the law is transgressed, and the preference is illegal. That the debtor co-operated actively here is clear. After the action was commenced, knowing his hopeless insolvency, and knowing that his brother's execution would ultimately absorb his entire available assets, he continued buying goods on credit, and carrying on his business ostensibly in the same manner as before he was sued. He was justified in selling from his stock in trade until judgment should be obtained and execution issued; but he had no right to contract debts which he knew he could not pay legitimately, or to acquire additional property, in order to increase the fund available for favored creditors. It is true he continued making payments to divers of his creditors from the proceeds of his sales after he was sued, but each of these payments, in his then condition, was a preference, so far as he was concerned. It is not unfair to assume, under such circumstances, that his intention was to pay off favored creditors, or conciliate those whose hostility he might fear. However this may be, the certain result of his course was to augment a fund for his brother's benefit, and subject such goods as he might not sell, to seizure in appropriate time upon the execution. It is to be presumed that he intended the natural and ordinary consequences to follow from his acts, but the proofs disclose

further evidence of a dishonest purpose, established by his own testimony. He admits that after he was sued, and after the time when judgment could have been entered against him, he was interviewed by an agent of one of his creditors, and led the latter to suppose that no change had occurred in his circumstances. The agent was fairly entitled to the information he requested, and the evasion of the debtor was such conduct as might be expected from one who was not disposed to deal fairly and impartially with his creditors.

That the brother knew that the debtor was so acting as to facilitate the former's purpose is evidenced by the signmcant circumstance that the former delayed the entry of judgment and issuing execution for ten days after these steps might have been taken. He knew the debtor was carrying on his business apparently as usual, and selling from his stock in trade. He knew that the collection of his debt was daily becoming more precarious. Why was he so indifferent as to his security? If he was the diligent and unrelenting creditor that is to be believed, if his version of the whole transaction is true, why is it that for ten days after he could have seized the stock on the execution he neglected to do so? No explanation of this strange indifference to his interests is vouchsafed. His conduct is inconsistent with his whole theory of the transaction, and, in view of the other facts, is quite convincing evidence of the utter falsity of the narrative of the parties. In short, I cannot resist the conclusion that the parties had a brotherly understanding of the situation; that they were, in fact, acting in harmony and concert, and that the delay in seizing the property was because the ripe moment had not come. That the parties intended the creditor should get his pay, while the other creditors generally should not, and that the form of a hostile legal proceeding was adopted to secure this result, is obvious beyond a doubt. That the parties intended that the debtor should preserve a nice equilibrium between acquiescence and co-operation is probably true, but under such circumstances the role is so difficult that slight indicia suffice to show that it has failed. In such cases courts are justified in being critical to detect these indicia, and should accord them ample weight when discovered. Upon the evidence here I am satisfied not only that the parties intended a preference should be secured, under color of legal process, and that the debtor co-operated to secure this result, but also that the creditor anticipated and relied upon such co-operation. A decree is ordered denying the prayer of the petitioner, and the validity of his lien upon the fund, with costs of the proceeding.